STATE OF VERMONT

SUPERIOR COURT                                    ENVIRONMENTAL DIVISION
                                                  Docket No. 98-8-15 Vtec

SECRETARY, VERMONT AGENCY OF
NATURAL RESOURCES,

          Petitioner,

v.                                                DECISION ON THE MERITS

FRANCIS SUPENO, BARBARA
SUPENO, and BARBARA ERNST,

          Respondents.

The matter before the Court is a request for a hearing on an Administrative Order (AO) issued by the Agency of Natural Resources (ANR) on June 25, 2015 imposing a $29,325 penalty on Francis Supeno, Barbara L. Supeno and Barbara J. Ernst (Respondents) for water and wastewater permit violations, and an illegal cross-connection between a private well and a public water supply at a rental house on Lake Champlain.[1]  The AO is the penalty phase of ANR's enforcement action in this case.  The bulk of the enforcement action took place in September 2014 when ANR discovered the violations and applied to the Court for an Emergency Administrative Order (EAO).  The Court granted the EAO, which required Respondents to correct the violations at 306 Fisher Point Road in Addison, Vermont (Rental Property).

Following some discovery disputes in the matter of the AO, the Court denied cross-motions for summary judgment and then granted Respondents a continuance.  The Court finally

---

[1] Respondents also filed an action against ANR in the Civil Division, alleging discrimination and other constitutional torts relating to this enforcement action.  On November 13, 2015, Respondents filed a motion to stay this proceeding pending the outcome of their civil case.  While Respondents' motion to stay was pending in this Court, the Civil Division stayed Respondents' civil action.  We therefore determined that Respondents' motion to stay in the Environmental Division was moot and we proceeded to trial.

1

conducted a single day merits hearing on April 20, 2017. The ANR appeared at trial represented by attorney John S. Zaikowski, Esq. Also appearing were Barbara Supeno and Barbara Ernst, represented by attorney David E. Bond, Esq. Francis Supeno is also represented by Attorney Bond, however, Mr. Supeno was not present at trail.

**Findings of Fact**

1.      Respondents Francis J. Supeno and Barbara L. Supeno, brother and sister, own property at 306 Fisher Point Road in Addison, Vermont (Rental Property). This property was operated as a rental house. Barbara J. Ernst has some involvement with the property and rentals.

2.      Respondents Barbara L. Supeno and Barbara J. Ernst own and reside on the adjacent property at 330 Fisher Point Road in Addison, Vermont. Francis J. Supeno lives in Massachussets.

3.      Respondents Francis and Barbara Supeno obtained a Wastewater System and Potable Water Supply Permit (#WW-9-1411) on October 22,2009 (WW Permit).

4.      The WW Permit authorizes the replacement of a former seasonal cottage with a year-round single family residence having one bedroom, the construction of an on-site potable water supply from a drilled bedrock well, and wastewater disposal system to be located on the adjoining 330 Fisher Point Road.

5.      The water supply at 330 Fisher Point Road is provided by the Tri-Town Water District #1, which is a public water supply system.

6.      In June 2014, ANR received a complaint of alleged violations of the WW Permit at 306 and 330 Fisher Point Road.

7.      At the time of the complaint, 306 Fisher Point Road was advertised for rental as a two-bedroom, two-bathroom home.

8.      In August 2014, in response to the June 2014 complaint, ANR sent e-mail communication to Respondents as part of ANR's investigation of the complaint. No response was received.

9.      In September 2014, ANR visited 330 Fisher Point Road as part of its investigation into the complaint. Respondent Barbara Supeno denied ANR access into the house.

10.     ANR petitioned this Court for an Access Order. The Access Order was granted on September 9, 2014. That same day, ANR completed a site visit to 306 Fisher Point Road.

11.    On September 18, 2014, the ANR Secretary applied to this Court for an EAO pursuant to the provisions of 10 V.S.A. § 1973(a)(6), 10 V.S.A. § 8009(a)(3), and V.R.E.C.P. 4(c).  That same day, the Court conducted an initial hearing on the application and issued the EAO in docket no. 142-9-14 Vtec.

12.    The EAO establishes three broad violations.

13.    The first violation resulted from Respondents' failure to obtain a permit before modifying the rental home at 306 Fisher Point Road to add a second bedroom in the basement, increasing the design flow of the building to an amount that is approximately double the design capacity of the wastewater system authorized in the wastewater system and potable water supply permit in violation of 10 V.S.A. § 1973(a)(6) and Condition 3.6 of the Wastewater System and Potable Water Supply Permit #WW-9-1411.

14.    Altering the home's use to a rental property also had the potential to increase the flow of the potable water and wastewater.

15.    Increasing wastewater flows causes a risk of failure to the wastewater system which in turn could result in human exposure to contaminates and/or contamination of soil and groundwater.

16.    The second and third violations resulted from Respondents splicing into the water supply line from Tri-Town Water, a public water system that serves 330 Fisher Point Road, and connecting it to the Rental Property.  The Rental Property also had a permitted drilled well.  An unapproved cross-connection allowed Respondents to switch between the two water sources.

17.    The second violation was Respondents' failure to obtain a permit before making a new or modified connection to a new or existing potable water supply in violation of 10 V.S.A. § 1973(a)(7) and Wastewater System and Potable Water Supply Permit #WW-9-1411, Conditions 1.1, 1.2, and 2.1.

18.    The third violation was Respondents' unapproved cross-connection, which was prohibited by Water Supply Rule § 21-8.  The interconnection subjected the public water system (Tri-Town) to the risks associated with introducing water from a different source, in which potentially polluted water could be drawn into the public water system.

3

19.     Respondents caused the cross-connection to be removed on September 22, 2014, four days after the initial EAO application hearing and nearly two weeks after ANR discovered the violations.

20.     Respondents timely requested a hearing on the EAO, which the Court held on September 25, 2014 pursuant to 10 V.S.A. § 8009(d) and V.R.E.C.P. 4(c)(3).  Following the hearing, the Court modified the EAO to allow Respondents to seek a permit from ANR to connect the Rental Property with the public water supply.  The modified EAO was issued on October 2, 2014.

21.     In signing the two emergency administrative orders, the Court found that the alleged violations took place.  Respondents did not appeal that determination.

22.     On June 25, 2015, ANR issued an AO for the same violations included in the EAO.  No new violations were added.  The AO assessed a $29,325 penalty against the Respondents.

23.     ANR served Respondents with the AO on August 3, 2015.

24.     Respondents timely requested a hearing on the AO with this Court.

25.     The state's actual cost of enforcement includes the value of the time that ANR officials committed to responding to Respondent's violations, including prosecution of the trial before this Court.  This included Environmental Enforcement Officer Dan Mason, Chief Environmental Enforcement Officer Sean McVeigh, and Engineer David Swift for a total cost of $6,213.

26.     Although ANR offered some evidence regarding the financial gain that Respondents enjoyed by operating 306 Fisher Point Road as a rental property, that evidence does not provide a clear picture of actual economic gain.

**Penalty Assessment**

When a respondent requests a hearing on a penalty assessed in an AO, we are required to "determine anew the amount of a penalty" that should be assessed against the respondent challenging the ANR order.[2]  10 V.S.A. § 8012(b)(1), (4).  We therefore review the evidence before

---

[2] Respondents offered into evidence many Exhibits (including but not limited to Exhibits H, I, K, L, M, N, S, T, U, V, W, X, Z, AA, CC and HH) which are copies of e-mail exchanges between Respondent Barbara Supeno and Environmental Enforcement Officers, ANR engineers, the Secretary of ANR, Vermont's Governor, and U.S. Environmental Protection Agency staff. The offer in support of this evidence was that the Respondents had antagonized ANR staff with their persistent complaints, and ANR conspired to retaliate against Respondents by assessing a high fine.  At trial, these exhibits were admitted on the condition that Respondents would produce other evidence supporting their retaliation claim.  As no other evidence was offered, these exhibits are given little weight by the Court in assessing a penalty.  We additionally note that on appeal, the Court calculates the penalty, not ANR.

4

the Court and determine an appropriate penalty assessment, pursuant to the eight subsections of 10 V.S.A. § 8010(b)(1)–(8).

ANR, and this Court in this proceeding, must consider seven factors when assessing a penalty:

(1)  the degree of actual or potential impact on public health, safety, welfare, and the environment resulting from the violation;
(2)  the presence of mitigating circumstances, including unreasonable delay by the Secretary in seeking enforcement;
(3)  whether the respondent knew or had reason to know the violation existed;
(4)  the respondent's record of compliance;
(5)  [Repealed.]
(6)  the deterrent effect of the penalty;
(7)  the State's actual costs of enforcement; and
(8)  the length of time the violation has existed.

10 V.S.A. § 8010(b)(1)–(8).  The maximum penalty for each violation is $42,500, plus $17,000 for each day a penalty continues.  Id. § 8010(c)(1).  Generally, ANR treats multiple violations of the same permit, or related violations generally, as one violation when calculating penalties.  We take the same approach in this case, and analyze the three violations as a single violation.

The State may also "recapture economic benefit" that the violator may have derived from the violation, up to the total maximum penalty allowed of $170,000.  Id. § 8010(c)(2).

In an effort to standardize penalties and ensure a fair process, ANR enforcement officers use a form that is based on the seven factors.  They rate the severity of the violations from 0 to 3 for factors (1), (3), (4) and (8), and come up with an initial penalty score.  The highest possible initial score is a 15, which equates to an initial penalty of $42,500 for a Class I violation, the maximum allowed.  Classes II, III, and IV carry lower maximum penalties of $30,000, $10,000 and $3,000 respectively.  The initial penalty can then be adjusted based on penalty factors (2), (6) and (7).  If the violator signs an Assurance of Discontinuance, agreeing not to dispute the action, the final penalty may be reduced by 25%.

---

Evidence of complaints made by Respondents does not affect the Court's analysis of assessing an appropriate penalty in this matter.

At the outset of the Court's penalty assessment, we conclude that this matter presents a Class II violation. A Class II violation includes "[a]ctivities or construction initiated before the issuance of all necessary environmental permits." ANR Administrative Penalty Form, Class II, subsection 2. In this matter, the October 2, 2014 EAO established three violations: the failure to obtain a permit before the modification of an existing building or structure in a manner that increases the design flow or modifies other operational requirements of a potable water supply or wastewater system; the failure to obtain a permit before making a new or modified connection to a new or existing water supply; and installation of an unapproved cross-connection between public and non-public water supply systems. We therefore classify the violation(s) as Class II.

A.      Calculation of Base Penalty:

   a. *Penalty Factor 1: Actual or Potential Impact on Public Health, Safety, Welfare and the Environment*

Subsection (1) of 10 V.S.A. § 8010(b) requires consideration of "the degree of actual or potential impact on public health, safety, welfare and the environment resulting from the violation." There is no credible evidence that the violations caused an "actual impact" that harmed the public health, safety, welfare, or the environment. ANR Administrative Penalty Form (ANR form) Questions 1 and 2.

Respondents' violations of modifying the use of the home by increasing the number of bedrooms potentially increases the flow of the potable water and wastewater. Likewise, altering the home's use to a rental property also had the potential to increase the flow of the potable water and wastewater. Increased wastewater flows have the potential to exceed the flow design capacity of the wastewater system and therefore result in the potential adverse impacts on public health, safety, welfare, and the environment. Increasing wastewater flows causes a risk of failure to the wastewater system which in turn could result in human exposure to contaminates and/or contamination of the soil and groundwater.

The parties introduced conflicting evidence concerning the potential adverse impacts on public health, safety, welfare, and the environment from the cross-connection. The adverse impact is the potential of exposing the public water supply to a water source of unknown quality; this being the private well. The concern is the possibility of water from the private well flowing

6

into the public water system.  First, ANR offered evidence of past use of the cross-connection system and that even if the cross-connection was temporarily disconnected, it could have been re-connected.  ANR testified that Respondent Ernst confirmed that within three months of ANR's inspection, Respondents were switching the water supply between the well and the public supply.

Respondents offered that the cross-connection was taken out of service shortly after the cross-connection was constructed by decommissioning the well.  As such, water from the well could not have potentially harmed the public water system.  They also contend that Ernst's statement regarding switching between the well and public supply was erroneous.  We have concerns with the credibility of Respondents' testimony here.  The offered purpose of the cross-connection was an alternate water supply for 330 Fisher Point Road, but this is not rational as it would have been less effort to directly connect the well to 330 Fisher Point Road, instead of running the connection from the well, through 306 Fisher Point, and then to 330 Fisher Point.  Thus, we conclude that there was some potential for impact to public health, safety, and welfare stemming from the cross-connection.

In considering ANR's penalty calculation form, we assign a value of "1" to the degree of impact on public health, safely, and welfare (ANR form Question 1) and a value of "1" to the degree of impact on the environment (ANR form Question 2) as we conclude there is moderate potential impact from the potential failure of a wastewater treatment system.[3]

b. *Penalty Factor 3: Whether the Respondent Knew or Had Reason to Know the Violation Existed*

Subsection (3) of 10 V.S.A. § 8010(b) requires consideration of "whether the respondent knew or had reason to know the violation existed."   The ANR penalty calculation form includes two parts related to this subsection: 3a, knowledge of the requirements, and 3b, knowledge of the facts of the violation.   Respondents knew or should have known about their legal

---

[3] If the Court were to consider the cross-connection violation alone, we would likely as assign a value of "0" to the degree impact on public health, safely, and welfare (ANR form Question 1) and a value of "0" to the degree of impact on the environment (ANR form Question 2) as we would likely conclude there was minor potential impact from the cross-connection.  As we treat all violations in one calculation we use the moderate impact based on the potential failure of the wastewater system.

requirements under the WW Permit and the facts of the violations. The credible evidence shows that Respondents had a permit limiting the use of 306 Fisher Point to one bedroom and expressly authorizing a water supply from a private well. Thus, in considering ANR's penalty calculation form, we assign a value of "2" for respondents' knowledge of requirements (ANR form Question 3a, which assigns a "2" where respondent "had a permit or permit by rule"). As to Respondents' knowledge of the facts of the violations we assign a value of "2," concluding there is "some evidence that the Respondent knew the violation existed" (ANR form Question 3b). For instance, Respondents' plumber, Everett Windover, a water quality specialist with Culligan, testified that in 2010 he explained the prohibition again cross-connection of water supplies and associated concerns to Respondents and that they understood the issues.

c. *Penalty Factor 4: Respondent's Record of Compliance*

Subsection (4) of 10 V.S.A. § 8010(b) requires consideration of "the respondent's record of compliance." The evidence presented shows that Respondents had no previous violations of ANR's regulations. In considering ANR's penalty calculation from, we assign a value of "0" for this subsection (ANR form Question 4).

d. *Penalty Factor 8: Length of Time the Violation Existed*

Subsection (8) of 10 V.S.A. § 8010(b) requires consideration of "the length of time the violation has existed." Respondents testified that the cross-connection was constructed in October 2009. ANR offered evidence that the cross-connection violation existed for years; at a minimum from late 2009 through 2011. Respondents countered that the cross-connection was effectively taken out of service soon after it was constructed. Respondents called their plumber, who testified that he decommissioned the well water in November 2011 by disconnecting electricity to the well pump and removing filter bowls. Respondents' plumber further testified that he physically removed the cross-connection by severing the plumbing in September 2014. At the time of removing the cross-connection, the plumber reconnected the well.

At a minimum, the cross connection was in place from October 2009 to November 2011, which is not a short duration. The court could conclude that the violation existed for a long duration, from 2009 to 2014, by concluding that the plumbing of the cross-connection was in

place for this entire period and could easily have provided water from either the well or the public system. We conservatively give some benefit to Respondents' offer that some temporary measures were taken in 2011 to take the well out of service. In considering ANR's penalty calculation form, we assign a value of "2" on the cross-connection alone, concluding that this violation existed for a moderate duration (ANR form Question 5).

The length of time that Respondents had the potential for increased wastewater flow correlates to the period when respondents rented the property and had an extra bedroom. This period was from July 2010 through September 2014; more than four years. We consider the potential for impact and therefore do not limit the violation to the actual number of humans using the property during the rental period. In considering ANR's penalty calculation from, we assign a value of "3" concluding the potential for increased wastewater flow existed for a long duration (ANR form Question 5).

Thus, taking these violations together results in a single, long duration violation that is given an assessment of "3" for the length of time the violation existed.

In adding the above penalty scores we arrive at a base score of 7 which equates to a base penalty of $12,000 for a Class II violation. See ANR form Question 6.

B.    Penalty Adjustments:

We next consider appropriate adjustments to the base penalty.

e.    *Penalty Factor 2: Mitigating Circumstances*

Subsection (2) of 10 V.S.A. § 8010(b) requires consideration of "the presence of mitigating circumstances, including unreasonable delay by the secretary in seeking enforcement." ANR attempted a prompt site visit in response to the complaint of potential violations and associated environmental concerns. Respondents did not allow ANR access to investigate the complaint. ANR was required to obtain a court order for access. With the Access Order, ANR officials responded promptly and attempted to bring the subject property into compliance voluntarily. ANR first pursued an emergency order to obtain compliance and then sought penalties at a later date pursuant to the express reservation within the emergency order of the right to subsequently pursue penalties. This evidence supports the timeliness of ANR's actions. After denying ANR

9

access, objecting to the emergency order and requesting a hearing on the emergency order, Respondents remediated the violations.

At the conclusion of trial, Respondents requested that the Court take judicial notice of the ANR orders from other enforcement actions which Respondents filed in support of an earlier motion for summary judgment. These other actions appear to be a hand-picked subset from the pool of all ANR enforcement actions. The other actions include Environmental Citations issued pursuant to 10 V.S.A. § 8019 which have a statutory maximum penalty of $3,000. Environmental Citations are available for ANR's use in response to minor violations. We conclude that the penalties established within an Environmental Citation are not analogous to the events and facts of this matter. Furthermore, each enforcement matter has unique and specific underlying facts. The underlying facts support the amount of fine imposed in each case. Thus, it would be difficult to simply review an AO and correlate the penalty to the facts of this matter without ANR's explanation of how it arrived at the penalty in the other matters.

Based on these facts, the Court declines to reduce Respondents' penalty based on mitigating circumstances.

f. *Penalty Factor 6: The Deterrent Effect*

Subsection (6) of 10 V.S.A. § 8010(b) requires consideration of "the deterrent effect of the penalty." The Secretary may increase the penalty amount up to the maximum allowed in the class of violation if the Secretary determines that a larger penalty is reasonably necessary to deter the respondent and the regulated community from committing future violations. Id. In this matter the maximum penalty is $30,000 and the base penalty we have calculated is $12,000, allowing for a maximum deterrent of $18,000.

When people make decisions, they consider the risk of penalties and other negative consequences of their prior decisions. In reviewing the importance of establishing a penalty that will have a deterrent effect upon Respondents, we consider that Respondents were not cooperative with ANR and denied ANR access at the time of the original site visit. Furthermore, we conclude that the long period of time that the violations existed, despite the fact that Respondents knew or should have known about the violations, warrants a deterrent penalty.

At trial, Respondents Barbara Supeno and Barbara Ernst offered their inability to pay a high penalty. Respondent Francis Supeno did not offer evidence on his ability to pay a penalty. Respondents did offer into evidence that they had paid expenses for the rental property in excess of $150,000 in 2010, $80,000 in 2011, $71,000 in 2012 and $97,000 in 2013. Respondents also offered that Francis Supeno was primarily responsible for the property's finances. We therefore decline to conclude that the Respondent do not have an ability to pay a high penalty.[4]

We therefore conclude a need to impose an additional penalty of $9,000 (50% of the maximum of $18,000) as deterrent for Respondents to avoid future violations.

g. *Penalty Factor 7: State's Actual Costs of Enforcement*

Subsection (7) of 10 V.S.A. § 8010(b) requires that we consider "the state's actual cost of enforcement." The value of the time that all ANR officials committed to responding to Respondent's violations, including prosecution of this matter, totals $6,213. We direct Respondents to reimburse these costs as an additional penalty for the violations.

h. *Economic Benefit*

The Secretary may recapture any economic benefit Respondents may have gained by violating its permit. 10 V.S.A. § 8010(c). ANR offered that the gross receipts received by Respondents from rentals was economic benefit resulting from the violations as Respondents did not have the approvals needed for rental generally or the extra bedroom. Based on Respondents' own evidence, gross rental receipts during the violation period approximated $165,000. Respondents offer evidence that they incurred operating expenses for the rental property in excess of $150,000 in 2010, $80,000 in 2011, $71,000 in 2012 and $97,000 in 2013, and therefore, they argue that there is no economic gain. We have credibility concerns with Respondents' offered expenses. First, during cross examination, ANR established considerable duplicate accounting of expenses. Second, Respondents' offer of operating expenses relating to a two-bedroom house rental exceeding an average of $410 per day for every day of 2010 is beyond credible. Lastly, we have no way of confirming that the expense accounting offered by Respondents is an accurate allocation of expenses reasonably related to rental income.

---

[4] Furthermore, ability to pay is not among the factors to be considered when calculating a penalty. 10 V.S.A. § 8010.

While we believe that recapturing economic gain from a violation is appropriate, we conclude that based on the evidence before the Court, we cannot calculate the gain in this matter. Thus, we decline to impose any amount of additional penalty relating to economic gain.

i. *Reduction for Settlement*

Finally, ANR may reduce a respondent's penalty when the respondent admits the violation and enters an Assurance of Discontinuance fully resolving the compliance issue. Such a reduction is not warranted in this matter as Respondents neither admitted the violations nor resolved their disputes by settlement.

The Court therefore increases the base penalty of $12,000 by adding $9,000 as deterrent and adding $6,213 as reimbursement of ANR's costs of enforcement. The total penalty in this case is $27,213.

### Conclusion

For the reasons stated above, we conclude that for the violations at issue within the October 2, 2014 EAO, Respondents shall be liable for a total penalty in these proceedings of **$27,213.00.**

### Rights of Appeal (10 V.S.A. § 8012(c)(4)–(c)(5))

This Decision and the accompanying Judgment Order will become final if no appeal is requested within 10 days of the date this Decision is received. All parties to this proceeding have a right to appeal this Decision and Judgment Order. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to superseding provisions in Vermont Rule for Environmental Court Proceedings (V.R.E.C.P.) 4(d)(6). Within 10 days of the receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of the Environmental Division of the Vermont Superior Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this

Court.  10 V.S.A. § 8013(d).  A party may petition the Supreme Court for a stay under the provisions of the Vermont Rules of Civil Procedure (V.R.C.P.) 62 and V.R.A.P. 8.

A Judgment Order accompanies this Decision.  This concludes the current proceedings before this Court.

Electronically signed on May 15, 2017 at 2:42 PM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division